NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| FRANCISCO CAUSING | : | |
| | : | |
| | : | |
| Plaintiff, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHAEL J. ASTRUE, | : | Civil Action No.: 09-3039 (DMC) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

---

DENNIS M. CAVANAUGH, U.S.D.J.

This matter comes before the Court upon the appeal of Francisco Causing ("Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). No oral argument was heard pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, the final decision of the Commissioner is **affirmed**.

I.      **BACKGROUND**

A.      **PROCEDURAL HISTORY**

On July 9, 2001, Plaintiff filed an application for SSI alleging disability beginning on June 10, 2001. On October 25, 2001, that claim was denied. Upon request by Plaintiff, a hearing before an Administrative Law Judge ("ALJ"), Brian H. Ferrie, was scheduled for February 11, 2003. As

a consequence of Plaintiff's failure to appear, on March 19, 2003, the ALJ dismissed the Plaintiff's claim.  Plaintiff sought review of that decision, and the Appeals Council vacated that Order of dismissal on May 5, 2005.  Subsequently, Plaintiff appeared and testified at a hearing conducted before the ALJ on November 16, 2006. On December 21, 2006, the ALJ issued a partially favorable decision (Administrative Transcript ("Tr.") at 14-20).  Plaintiff again sought review, but on April 23, 2009, the Appeals Council denied his request.  Thereafter, Plaintiff timely commenced an appeal before this Court.

### B.   FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

On December 21, 2006, the ALJ made the following six (6) findings regarding Plaintiff's application for SSI: (1) the claimant has not engaged in substantial gainful activity since June 10, 2001, the alleged onset date; (2) prior to November 25, 2002, there is insufficient evidence to demonstrate that the claimant had any severe medically determinable impairment or combination of impairments; (3) beginning on November 25, 2002, the claimant exhibited the following severe impairments: back pain due to a fracture of T12 and schizophrenia; (4) prior to November 25, 2002, the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) beginning on November 25, 2002, the severity of the claimant's schizophrenia has met the requirements of section 12.03 of Appendix 1; (6) the claimant was not disabled prior to November 25, 2002, but became disabled on that date and has continued to be disabled through the date of the ALJ's decision (Tr. at 14-20).

### C.   FACTUAL HISTORY

Plaintiff was born on October 4, 1955. (Tr. at 21).  Plaintiff is originally from the Philippines

but is now a naturalized citizen of the United States. (Tr. at 21).  Plaintiff has a high school diploma and an associate's degree in marine engineering from a Filipino college. (Tr. at 61).  Since moving to the U.S., Plaintiff has worked mostly blue-collar jobs. (Tr. at 68).  Plaintiff was also a U.S. Merchant Marine from 1993 to 1994. (Tr. at 74-75).  From April 2001 to June 2001, Plaintiff worked as a porter for a fast food restaurant. (Tr. at 75).  In 2002, Plaintiff worked part-time delivering food for a restaurant. (Tr. at 269).  Plaintiff's last job was from September 17, 2004 to May 2005 which involved hanging and marking loads. (Tr. at 268). On November 26, 2002, Plaintiff was noted to sustain a fracture of the T12 vertebrae resulting from an assault and was also diagnosed with paranoid schizophrenia. (Tr. at 18).

### D.  TESTIMONIAL RECORD

#### 1.  *August 4, 2005 Hearing*

Plaintiff testified before an ALJ on August 4, 2005. (Tr. at 262).  Plaintiff testified on that date that he was not currently working. (Tr. at 267).  Plaintiff indicated that his last job was from September 17, 2004 to May 2005. (Tr. at 267-68).  Plaintiff worked sixty hours a month hanging and marking loads. (Tr. at. 268-69).  Plaintiff further explained that he did not work in 2003 due to his chronic back pain. (Tr. at 269).  Plaintiff testified that in 2002 he worked part-time delivering food. (Tr. at 270-71).  Plaintiff indicated that he worked full-time from 1984 to 1994, doing mostly blue-collar jobs. (Tr. at 270-271).  Plaintiff stated that he is currently on welfare and lives in an apartment with the aid of rental assistance. (Tr. at 273).  Plaintiff noted  that he had been homeless from 2000 to 2003.  (Id.)  Plaintiff explained that he uses food stamps and attends soup kitchens to eat. (Tr. at 274).  Plaintiff testified that he was naturalized as a U.S. citizen in 1991. (Tr. at 274). Plaintiff

maintained that he was unable to work because of chronic back pain. (Tr. at 276).  Plaintiff further testified that even when he was working part-time, he was consistently fired as a consequence of chronic pain his back compromising his ability to move. (Tr. at 279).

Plaintiff's also testified to problems he had with his wife and the pastors of his church. (Tr. at 281).  Plaintiff indicated that the pastors had told his wife that he was possessed by a demon. ( Tr. at 281).  Plaintiff also testified that a psychiatrist diagnosed him with schizophrenia because he was being set up by the Filipino church and his wife. (Tr. at 284).  Plaintiff claimed that his problems with the church stemmed from Plaintiff's ability to perform miracles and heal others. (Tr. at 286). When asked about the medication he was taking while seeing the psychiatrist for schizophrenia, Plaintiff responded that he was taking Ibuprofen, Ativan, and other medication, the names of which Plaintiff could not recall. (Tr. at 291).  Plaintiff testified that he stopped taking the medications because it "brings torment" on him.  (Tr. at 291).

2. *November 16, 2008 Hearing*

During the November 16, 2008 hearing, Plaintiff again testified to being a naturalized U.S. citizen originally from the Philippines. (Tr. at 305). Plaintiff reiterated he held mostly blue collar jobs, including a tenure as a Merchant Marine. (Tr. at 305). Plaintiff detailed a July 1994 arrest (Tr. at 306), explaining that he was arrested for domestic violence and incarcerated for one year. (Tr. at 307). Plaintiff claimed that he was "set-up" by his former church and did not commit the crime. (Tr. at 307). In terms of employment, Plaintiff testified that he worked in a restaurant delivering food for a couple months in 2002. (Tr. at 310) He also stated he held another job hanging price tags on clothes. (Tr. at 310). Plaintiff did not work in 2003 (Tr. at 311). Plaintiff indicated that he pays for

his apartment through welfare, and often visits soup kitchens. (Tr. at 311). As in the 2005 hearing, Plaintiff reiterated that he had problems at work because he moved too slowly due to the constant back pain. (Tr. at 312). He was being treated for his back pain at the time of the ALJ hearing. (Tr. at 312). Plaintiff claimed that he could not work because of the back pain (Tr. at 313). Finally, Plaintiff testified that he was not seeing a psychiatrist or taking medication (Tr. at 318).

### E. MEDICAL RECORDS

#### 1. *State Agency Examinations*

On October 25, 2001, an Initial Disability Determination was conducted on Plaintiff. (Tr. at 25). The primary diagnosis was "affective/mood disorders" and the secondary diagnosis was "disorders of back." (Tr. at 25). The impairment was not considered severe. (Tr. at 26). There was insufficient evidence to substantiate the presence of any "organic mental disorder" or "schizophrenia and other psychotic disorder." (Tr. at 27-28). The consultant stated Plaintiff "had very little in the way of psychiatric symptoms" (Tr. at 38). The consultant determined his mood was normal. (Tr. at 38).

On November 26, 2002, the New Jersey Division of Family Development and the Division of Medical Assistance and Health Services examined Plaintiff. (Tr. at 138). Each agency diagnosed Plaintiff with a chronic lower back disorder as a result of a fracture of the T12 vertebrae that Plaintiff had sustained in an assault. (Tr. at 138, 145). Each agency diagnosed Plaintiff with schizophrenia and concluded that Plaintiff was unable to work. (Tr. at 138, 145).

#### 2. *Consultative Examinations*

Two independent consultative examinations were performed on Plaintiff in August and

September of 2001.

On August 9, 2001, Dr. L. Vassallo examined Plaintiff. (Tr. at 101).  Plaintiff complained of back pain, but Dr. Vassallo concluded that Plaintiff had normal range of motion of all joints, was able to walk without a limp, and sit comfortably. (Tr. at 102).  Dr. Vassallo also concluded that Plaintiff had no neurological deficit in the upper or lower extremities. (Tr. at 102).

On September 14, 2001, Dr. Alec Roy examined Plaintiff (Tr. at 107).  Plaintiff told Dr. Roy that he was not taking any psychiatric medications. (Tr. at 107). Plaintiff also stated that he was not seeing any psychiatrist or counselor. (Tr. at 107). Dr. Roy asked Plaintiff about bodily symptoms that might indicate a psychiatric disorder.  Plaintiff revealed during the questioning that he sleeps well and has a good appetite.  (Tr. at 107). Regarding his energy, Plaintiff replied that he gets tired at the end of the day. (Tr. at 107). When asked about his mood, Plaintiff stated, "my mood, I am happy, I enjoy my life, I am a clean boy." (Tr. at 107).  Although never a psychiatric patient, Plaintiff told Dr. Roy that he had seen a psychologist in 1994 or 1995 (Tr. at 108).  Plaintiff stated he was also incarcerated and may have received the neuroleptic Haldol while incarcerated. (Tr. at 108). Dr. Roy reported Plaintiff as having a normal mood and not anxious or depressed. (Tr. at 108). Dr. Roy concluded there was no evidence of hallucinations or paranoia. (Tr. at 108). Dr. Roy performed a global assessment of functioning ("GAF"), and Plaintiff achieved a score of 85 on the GAF scale. (Tr. at 109).[1]  Dr. Roy concluded, "[Plaintiff] currently has very little in the way of psychiatric symptoms." (Tr. at 109).

---

[1]

 The Court notes that the GAF scale assesses an individual's overall level of functioning. The range is 100 to 0. A score of 85 means "absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns."

### 3.   Columbus Health Center Medical Records

Plaintiff was seen by Dr. W. Wassef at the Columbus Health Center during the period of July 31, 2001 to February 7, 2002.  During that time, Plaintiff informed Dr. Wassef that he had a nervous breakdown in 1994 and was prescribed Haldol. (Tr. at 119).  Dr. Wassef reported that Plaintiff has a "history of schizophrenia." (Tr. at 119). Plaintiff told Dr. Wassef that he was not on any anti-psychotic medication at the time of the evaluation.  (Tr. at 119).  Plaintiff claimed he was suffering from chronic lower back pain and was taking Ibuprofen (Tr. at 120).

On February 7, 2002, Dr. Wassef noted that Plaintiff had chronic lower back pain and a history of schizophrenia.  (Tr. at 120). Plaintiff was treating his pain with Ibuprofen. (Tr. at112). Under the work limitations section, Dr. Wassef checked off the "no work" box. (Tr. at 110).  When asked to clarify his findings by the Division of Vocational Rehabilitation, Dr. Wassef indicated that Plaintiff suffered from chronic lower back pain syndrome, but was cleared to go to work with a restriction on heavy lifting. (Tr. at 115).  Dr. Wassef also indicated that Plaintiff was capable of entering a vocational rehabilitation program. (Tr. at 115).

### 4.   Social Security Administration Assessment

The Social Security Administration conducted a disability assessment of Plaintiff on July 10, 200. (Tr. at 64).  The report concluded that Plaintiff did not have difficulty sitting, standing, or walking. (Tr. at 66).  The physician reported that Plaintiff was able to stand, sit and walk without noticeable discomfort (Tr. at 66).

## II.  STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir.

2000).   Substantial evidence is "more than a mere scintilla . . . but may be less than a

preponderance." Woody v. Sec'y of Health & Human Servs, 859 F.2d 1156, 1159 (3d Cir. 1988).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such

relevant evidence which, considering the record as a whole, a reasonable person might accept as

adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation

omitted).  Not all evidence is considered "substantial."  For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.   Nor is evidence substantial if it is overwhelmed by other
> evidence–particularly certain types of evidence (e.g. that offered by treating
> physicians)–or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v.

Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  The ALJ must make specific findings of fact to

support his ultimate conclusions. Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." Jones v. Barnhart,

364 F.3d 501, 503 (3d Cir. 2004).  As such, it does not matter if this Court "acting *de novo* might

have reached a different conclusion" than the Commissioner. Monsour Med. Ctr. V. Heckler, 806

F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. NLRB, 804 F.2d 808, 812 (3d Cir.

1986)).  "The district court . . . is [not] empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)

(citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  A Court must nevertheless "review

the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing

<u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984)).  In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" <u>Id.</u> (quoting <u>Willibanks v. Sec'y of Health & Human Servs.</u>, 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, a court needs access to the ALJ's reasoning. Accordingly,

> [u]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

<u>Gober v. Matthews</u>, 574 F.2d 772, 776 (3d Cir. 1978) (quoting <u>Arnold v. Sec'y of Health, Educ. & Welfare</u>, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence."  <u>Ogden v. Bowen</u>, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing <u>Brewster v. Heckler</u>, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate why evidence was rejected, a court is not permitted to determine whether the evidence was discredited or simply ignored.  <u>See Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 121 (3d Cir. 2000) (citing <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir. 1981)).

## III.  APPLICABLE LAW

### A.    THE FIVE-STEP PROCESS

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. A claimant is considered disabled under the Social Security Act if he or she is unable to "engage in substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  A claimant bears the burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).

To make a disability determination, the Commissioner follows a five-step process pursuant to 20 C.F.R. § 416.920(a).  Under the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b).  Substantial gainful activity is work that involves doing significant and productive physical or mental duties, and is done (or intended) for pay or profit.  20 C.F.R. § 416.972.  If the claimant establishes that she is not currently engaged in such activity, the Commissioner then determines whether, under step two, the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.920(a)(4)(ii).  The severe impairment or combination of impairments must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  The impairment or combination of impairments "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909.  If the Commissioner finds a severe impairment or combination of impairments, he then proceeds to step three, where he must determine whether the claimant's impairment(s) is equal to or exceeds one of those included in the Listing of Impairments in Appendix 1 of the regulations ("Listings").  20 C.F.R. § 416.920(d).  Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits.  Id.  If, however, the claimant does not meet this burden, the Commissioner moves to the final two steps.

Step four requires the Commissioner to determine whether the claimant's residual functional capacity sufficiently allows a claimant to resume previous work.  20 C.F.R. § 416.920(e).  If the

claimant can return to previous work, then the claimant is not disabled and therefore cannot obtain benefits.  Id.  If, however, the Commissioner determines that the claimant is unable to return to past work, the analysis proceeds to step five.  At step five, the burden shifts to the Commissioner, who must find that the claimant can perform other work consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity.  20 C.F.R. § 416.920(g).  Should the Commissioner fail to meet this burden, the claimant is entitled to social security benefits.  20 C.F.R. § 416.920(a)(4)(v).

### B.    THE REQUIREMENT OF OBJECTIVE MEDICAL EVIDENCE

Under the Act, disability must be established by objective medical evidence.  "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A).  Credibility is a significant factor.  When examining the record:

> The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. § 416.929(c)(4).

-11-

A claimant's symptoms, then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

## IV.    ANALYSIS

On appeal, Plaintiff argues that the ALJ erred in denying his claim for SSI benefits for two reasons (Plaintiff's Brief ("Pl. Br.") at 1-2).  First, Plaintiff argues that the ALJ's failure to find a severe impairment prior to November 25, 2002 is not supported by substantial evidence (Pl. Br. at 14). Second, Plaintiff asserts that the ALJ should have consulted a medical expert to help determine the onset date of his schizophrenia (Pl. Br. at 26-29).

To assess whether a claimant has established a disability, an ALJ must analyze his or her claims pursuant to the five-step process provided for in the Social Security Act.  20 C.F.R. § 416.920(b).  In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 10, 2001, the application date.  At step two, the ALJ found that the Plaintiff did not have a severe impairment prior to November 25, 2002, but did have two severe impairments beginning on that date.  At step three, the ALJ found that beginning on November 25, 2002, Plaintiff's schizophrenia met listing 12.03.  The ALJ also found that prior to November 25, 2002, Plaintiff did not have an impairment that met or medically equaled an impairment in the listings.  The ALJ concluded that Plaintiff was not disabled prior to November 25, 2002, but became disabled on that date. (Tr. at 14-20).

### A.    Severe Impairment – Step 2

Plaintiff argues that the ALJ erred in failing to determine that Plaintiff's back injury and

mental impairment were not severe prior to November 25, 2002.  Plaintiff's argument is without merit.  The ALJ's decision is supported by substantial evidence in the record.

At step two of the analysis, Plaintiff bears the burden of introducing sufficient evidence to establish a severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987).  An impairment or combination of impairments is severe when it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 416.920(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs.  Examples include: physical functions such as walking, standing, sitting, lifting; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; and use of judgment.  20 C.F.R. § 416.921(b).

Moreover, in satisfying the burden at step two,  the regulations specify that an individual's impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statements of symptoms.  See 20 C.F.R. § 416.908.  Regulation § 416.928 further explains that "[s]igns are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms) . . .  They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 416.928(b).

Here, the ALJ relied on several medical examinations of Plaintiff to determine his back injury was not severe. During his disability interview with the Social Security Administration on July 10, 2001, the examiner reported Plaintiff had no difficulty sitting, standing, or walking (Tr. at 66). The examiner also indicated that Plaintiff was able to stand, sit and walk without noticeable discomfort. (Tr. at 66). Likewise, during his consultative examination, Dr. Vassallo concluded that Plaintiff had normal range of motion of all joints (Tr. at 102). Dr. Vassallo also indicated that Plaintiff was also able to walk without a limp and sit comfortably. (Tr. at 102). Plaintiff's limited treatment also

indicates he did not have a severe back impairment.  Plaintiff only took Ibuprofen and there is no evidence of surgeries or hospitalizations.

Additionally, Plaintiff's daily activities support the ALJ's decision that Plaintiff's back injury was not severe. 20 C.F.R. § 416.929(c)(3)(I). Plaintiff worked part-time and stated that he walked every day looking for a job. (Tr. at 77). Plaintiff also stated he regularly does household chores, such as sweeping the floor, taking out the garbage and doing laundry. (Tr. at 78). Plaintiff asserted that he could carry two bags of groceries weighing ten to twenty pounds. (Tr. at 77).  These activities, coupled with numerous medical exams and minimal treatment, support the ALJ's decision that Plaintiff's back injury was not a severe impairment prior to November 25, 2002.

The Court notes that discrepancies in medical reports were acknowledged by the ALJ and explained in his decision. See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) ("We are also cognizant that when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them."). Here, the ALJ noted that, in 2001, Dr. Wassef indicated that Plaintiff could not work, but also noted that the same doctor later indicated that Plaintiff should only avoid heavy lifting and could join a vocational rehabilitation program. (Tr. at 17). The ALJ rejected the first report because Dr. Wassef did not provide any physical evidence that Plaintiff had limited range of motion. (Tr. at 17).  Moreover, the ALJ was entitled to rely on the independent examination by Dr. Vassallo, who found no physical limitations. See Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989).

As with the findings pertaining to his back injury, the ALJ's decision that Plaintiff did not have a severe mental impairment prior to November 25, 2002 is supported by substantial evidence in the record.  Notably, Plaintiff was not receiving any psychiatric treatment or any anti-psychotic

medication during the relevant period. (Tr. at 107). Further, the fact that Plaintiff's application did not allege any mental impairment, undermines Plaintiff's contention that he suffered from schizophrenia during the relevant period. (Tr. at 21).  In fact, Plaintiff was examined several times before November 25, 2002 and was never once diagnosed with schizophrenia. The Initial Disability Determination Report dated October 21, 2001 determined Plaintiff did not have schizophrenia (Tr. at 27-28). In that report, Disability Services indicated Plaintiff had "affective/mood disorder[,]" but did not list it as severe. (Tr. at 26). Similarly, during his consultative examination, Dr. Roy concluded there was no evidence of hallucinations or paranoia (Tr. at 108). Dr. Roy stated, "he currently has very little in the way of psychiatric symptoms." (Tr. at 108).  Dr. Roy also indicated that Plaintiff's mood and thinking processes were normal. Finally, over the course of nearly three months, Dr. Wassef never mentioned schizophrenia in any of his reports, but did recommend Plaintiff for a vocational rehabilitation program (Tr. at 115).  Despite several medical examinations indicating Plaintiff had a "history of schizophrenia," in the absence of objective medical evidence, a claimant's subjective statement of symptoms is not sufficient to establish a severe impairment.  An impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 416.908. Plaintiff claims to have been prescribed Haldol and diagnosed with schizophrenia in 1994 (Tr. at 119), but a previous record of hospitalization or medication for schizophrenia does not exist. Plaintiff even indicated in 2001 that he was not on any anti-psychotic medication (Tr. at 107).

In addition to the medical evidence and Plaintiff's own statements, the ALJ also relied on Plaintiff's daily activities in determining that Plaintiff did not suffer from a severe mental impairment. See 20 C.F.R. § 416.929(c)(3)(I) (allowing an ALJ to consider daily activities when

evaluating the intensity and persistence of a claimant's symptoms). The ALJ indicated that Plaintiff was working part-time delivering pizza and grilling food (Tr. 17).  Plaintiff also indicated that he walked every morning to look for a job. (Tr. 77). These activities belie Plaintiff's allegations that he could not do any work.   Consequently, Plaintiff's daily activities, along with his medical examinations, lack of psychological treatment, and a failure to mention a mental disorder on the application, support the ALJ's finding that Plaintiff did not suffer from a severe mental impairment prior to November 25, 2002.

### B.   MEDICAL EXPERT

Plaintiff argues that the ALJ erred in failing to obtain the testimony of a medical expert to establish the onset date of his schizophrenia pursuant to Social Security Regulation ("SSR") 83-20. (Pl. Br. at 27). The Court finds Plaintiff's argument to be without merit. The ALJ was not required to obtain the testimony of a medical expert. SSR 83-20 states:

> Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling. With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began. . . . How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a

-16-

legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

This regulation permits, but does not require an ALJ to use a medical expert when determining the onset date of a disease that is unclear from the medical records. 20 C.F.R. § 404.1527(f)(2)(iii). When the medical evidence is ambiguous or unclear regarding the onset date, an ALJ should, but is not required to use a medical expert. Jakubowski v. Comm'r of Soc. Sec., 215 Fed. Appx. 104 (3d Cir. 2007). SSR 83-20 calls for a medical expert when there is no contemporaneous medical record from the time period in question.  Walton v. Halter, 243 F.3d 703 (3d Cir. 2001). An ALJ has broad discretion in determining whether to consult a medical expert. See Hardee v. Comm'r of Soc. Sec., 188 Fed.Appx. 127, 129 (3d Cir. 2006) ("These authorities accord an ALJ broad discretion in determining whether to consult with a medical expert, and we do not believe the ALJ erred by deciding that a consultation was not necessary in this case. The ALJ based his findings on a thorough analysis of the medical evidence, including reports and notes from numerous medical professionals.").  An ALJ must consult a medical expert when the onset date is far in the past and no medical records exist from the relevant time period. Walton v. Halter, 243 F.3d 703 (3d Cir. 2001).

In this case, the ALJ properly relied on the evidence before him, mainly medical examinations from several doctors in 2001, to ultimately determine an onset date of November 25, 2002. The medical evidence was available and unambiguous, creating no need for the services of a

-17-

medical expert.[2]  Plaintiff asserts that his schizophrenia began before November 25, 2002, yet the

evidence on record suggests the contrary. Plaintiff was examined several times in 2001 and 2002,

and no doctor determined he had schizophrenia prior to November 25, 2002.  In support of this

determination, the record contains two consultative examination reports, but neither report diagnosed

Plaintiff with schizophrenia.  Dr. Roy even reported, "[Plaintiff] currently has very little in the way

of psychiatric symptoms." (Tr. 108). Additionally, the November 25, 2002 onset date is consistent

with the medical evidence. The medical evidence is the primary factor in onset determination. See

SSR 83-20. None of the reports prior to November 25, 2002 diagnosed Plaintiff with schizophrenia.

In fact, a November 26, 2002 report by Dr. Wassef was the first time Plaintiff was diagnosed with

schizophrenia (Tr. at 138-146).

Plaintiff asserts he has a history of schizophrenia, but medical reports that a claimant has a

"history" of schizophrenia are insufficient to determine an onset date. Rather, contemporaneous

medical records from the relevant time period are required.  See 243 F.3d 703.  Medical records

claim that Plaintiff has a history of schizophrenia, but no record of a diagnosis exists until November

25, 2002 and no record of a Haldol prescription exists. The medical evidence from the relevant

period clearly shows that Plaintiff did not suffer from schizophrenia. Only after November 25, 2002

---

2

 Plaintiff relies on Walton v. Halter, 243 F.3d 703 (3d Cir. 2001) and Newell v. Commissioner, 347 F.3d 546 (3d Cir. 2003), but those cases are distinguishable from the present case. In Walton, the claimant sought child's disability insurance based on a mental illness, alleging an onset date prior to his twenty-second birthday of June 13, 1966. Walton at 705. The ALJ was forced, in 1994, to determine if the claimant's illness rose to the level of a disability prior to 1966. The claimant lacked medical records from before 1966.  Id. at 706. The Third Circuit concluded, "that an ALJ in a situation of this kind must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence." Id. at 709. The lack of a "personal, contemporaneous observation" dictated the use of a medical expert. Id. at 710. In Newell, the ALJ rejected the claim because the claimant's records lacked evidence of treatment for the several impairments during the relevant time period, but the Third Circuit reversed noting that although the claimant lacked treatment for her illnesses, she could not afford medical treatment during that time. Newell at 549. The Court concluded a medical expert was required because of the lack of contemporaneous medical records. Id. By contrast, in this case, medical records from the relevant time period exist.

-18-

does the evidence confirm a change in Plaintiff's mental state. In September 2001, Plaintiff's GAF was 85, (Tr. 109) whereas in April 2003 it was 40. (Tr. 245).[3]  An April 2003 examination by the Jersey City Medical Center determined that Plaintiff was "paranoid and religiously preoccupied" (Tr. 219). An examination by Dr. Lazzara in December 2005 found that Plaintiff had a delusional disorder. (Tr. 193). Plaintiff's testimony at two ALJ hearings in 2005 and 2006 also revealed that Plaintiff is delusional, paranoid, and religiously preoccupied. (Tr. 262-326). The evidence after November 25, 2002 differs from the evidence before that date, confirming a change in Plaintiff's mental state.

In light of the medical records in existence at the time of reviewing Plaintiff's claims, the ALJ was not required to consult a medical expert to establish an onset date of November 25, 2002.

## V. CONCLUSION

For the foregoing reasons, the ALJ's decision is **affirmed**. An appropriate Order accompanies this Opinion.

　S/ Dennis M. Cavanaugh　　

Dennis M. Cavanaugh, U.S.D.J.

Date:           August     26    , 2010
Original:      Clerk's Office
cc:              All Counsel of Record
                   File

---

[3]

 A GAF of 40 means "Some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV-TR 34.

-19-